Case number 18-4243, Marcel Eluhu v. Dept of Veterans Affairs. Oral arguments scheduled to be 15 minutes per side. Mr. Mark Thomas Freeman for the petitioner. May it please the court. Good morning, I'm Mark Freeman. I'm here on behalf of Dr. Marcel Eluhu. And I would like to reserve three minutes for rebuttal. We come before this court alleging that Dr. Eluhu is a whistleblower. And on February 6, 2017, he issued a letter. And that letter was a protected disclosure. He was complaining that doctors that were covering the intensive care unit were refusing to accept cardiac patients. Dr. Eluhu was a cardiologist at the Alvin York VA hospital. I've looked at the letter. What are the particular elements of danger did the letter make or purport to make the staff aware? What was the public safety component that he was addressing or calling attention to in that letter? If you take the letter in the context in which it was written, you have to understand that the and this is the easiest way I know to answer your question. And that is that the intensive care unit a few years prior to this time had been closed. There had been issues. And Dr. Eluhu had been working at the VA since 2006. So he was well aware of the history of the intensive care unit, history of the hospital there. And so when 2017 came around, he was concerned because he was not able to get the care for these patients that was needed. And he was concerned about the ability to transfer a patient that he was caring for that had heart issues into the intensive care unit. He was having difficulty doing that. And so the concern was that these doctors over the intensive care unit weren't addressing his concerns and that was affecting patient care, at least potentially could affect patient care, along with not following his recommendations for that care. So there was a risk there. And he wanted to express that. So more broadly, are you saying that because of the conditions that closed the hospital in the past, his concern was that if their current practices persisted, they could very well lead to, again, some kind of catastrophic closure which would deny people the benefit of being able to get that cardiac care at that facility? Right. That was the perspective in which he brought the letter, I think. Thank you. And so I don't know if the board saw this as more of a dispute between doctors. And that's not what it was. Dr. Eluhu had been there for years. He had had a fine record. He was not a doctor that was having trouble. He'd been there quite a while. Did the people who made the ultimate termination decision, were they aware, did they have knowledge of the letter and its contents? Well, this is what's interesting because Dr. Nedao, he was the one who recommended this to the director over the facility. And I found case law that said, well, if someone is recommending that, then that knowledge is imputed on the decision maker. And when you're saying recommended this, recommended that, you're talking about recommended his termination. Yes, Your Honor. Yes. And so I didn't handle the underlying case where the proof was taken. But when we got the transcript and we looked at it, Dr. Nedao was testifying. And at one point he said, well, I didn't really know. I didn't know that. And then moments later, didn't know about the letter. And so you're saying Nedao was testifying at the equivalent of a trial in front of the administrative agency, correct? Yes, Your Honor. So normally if we had a bench trial and the district judge made a finding of fact, we would have to accept that finding of fact unless there was clear error, right? So our standard here is the substantial evidence standard. Is that right? Yes, Your Honor. So why isn't there substantial evidence supporting what the administrative judge decided here? Because the judge, I think, disregarded his testimony shortly after he made that statement. And his statement just shortly after that was, I expect I saw it sometime around February 6th. Well, what about credibility finding? Is that it? No, I don't think so. Because if I say yes to that, then I think you might have to rely on what the judge decided in the lower hearing. I'm not saying that. What I'm saying is we can't disregard that testimony. We have a statement here that says I saw this letter, this e-mail, if you will, at or about the time it was sent. And I think that's... But even if you're correct on that, don't we still have the question whether the reason for the discharge is because your client was not at his post multiple times over a course of a period where he was being scrutinized? Right. And so when I looked at that issue, I found some cases that talked about knowledge and timing and how taking that into account. We have a situation here where the timing of the termination was so close. But weren't those cases summary judgment cases, saying that summary judgment is not appropriate if somebody's fired a day after some protected activity? Right. I mean, if it's the next day, I think one could look at that. And it should go to trial, unless you can point me to another case that I'm forgetting. But usually those are cases, it's my understanding, of summary judgment, where a district court might have granted summary judgment and we say, no, no, no, you're too quick to grant summary judgment because, after all, he was fired a day after he made his protected complaint. Right. And I read those cases to mean that if it's close in time, then that's sufficient to establish this presumption that it was as a result of the disclosure. Well, if it's a presumption, then isn't it for the finder of fact to decide whether or not, let's say, the multiple absences from his post during his working hours was the real cause as opposed to a made-up cause? Right. And you may be right if there was substantial evidence to support that, but there's not. Not substantial evidence to support what? That he wasn't in his post. I thought there was evidence presented in the administrative proceeding that somebody was checking up on him and couldn't find him. Yes. But if you dig a little deeper, you'll realize that she didn't even know what he looked like. This was an informal investigation by the secretary of Dr. Nadal, and he basically said, you don't need to know what he looks like. I just want you to walk around, ask if people have seen him. And she checked a few places and then came back and said, yeah, we can't find him. Never called his cell phone to see where he was. Didn't even know what he looked like. Dr. Nadal wanted a particular result, so he assigned a staff person, his right-hand person, to get that result. So what did the Merit Systems Protection Board and the lower decision makers from the agency, or whatever you want to call it, what did they say about the point that you're making? They said that the judge in that case basically said, I think this is a dispute between Dr. Lovelady and Dr. Aluhu. It's not a whistleblowing activity. And pretty much stopped there and didn't really go much further than that. They didn't assume, if it were a protected activity, that nonetheless he was discharged because of failing to be there? Well, I think she went a little further, may very well have concluded that. But again, the last prong of the, there was a third prong, and she didn't get into that issue, even though I think I briefed that issue. The problem that I see with what the judge did was came to, I think she rushed to judgment and determined that this was just simply a dispute between two doctors and didn't see what it really was in the perspective of Dr. Aluhu. And as a result, she didn't get into these other issues that I think are important. And when you ask somebody that's underneath you to go and search for a doctor that they don't even know what they look like, and you don't call them on a cell phone, you don't do any of those things, that's not an investigation. That's just an attempt to get what you want. I wanted to make a couple of other comments. And that is on the issue of the strength of the agency's evidence, which is, again, we're talking about what evidence did the judge have that they would have terminated him anyway, regardless of the letter. And we have to look at what his history was. He'd been there since 2006. He'd had good reviews. He'd never been written up for not being there. There weren't any issues like that. And when Dr. Nadal was asked, how did Dr. Aluhu come to your attention, he couldn't remember. He said, I don't know. That doesn't make any sense. Was there any evidence that your client had been criticized for not being at his post before the letter that he sent? I believe that maybe his supervisor had testified that there may have been some statements by individuals, so I don't want to misrepresent to the court. But as I understand it, they had auditors who would come in and do audits. And he was never written up. Those audits didn't show that there were any problems. And you have to understand that the Alvin York Medical Center, it's a huge complex. So he can be in a lot of different places at a given time. And this person that Dr. Nadal asked to go look to see where he was only went to a few places. Thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Ming-Yu Oh with the Justice Department, representing the Appellee Department of Veterans Affairs in this case. As the Court is aware, this case involves the removal of a part-time VA doctor. The first thing I want to address is the purported misconduct of Dr. Aluhu. That's not under appellate review in this case. What Congress conferred to this Court for jurisdiction is the whistleblower protection statutes. And so the underlying misconduct is not subject to review. He can't challenge that misconduct as part of this case. I understand that Mr. Freeman devoted part of his brief to discuss a portion of that. There are only two independent bases that the Board judge made in this case regarding the whistleblower issue. The first part is that the Board judge found that Dr. Aluhu did not make a protective disclosure. The second and separate independent finding is that the Board judge found that even if Dr. Aluhu made this disclosure, it wasn't a contributing factor to his removal. And the first thing I want to do is point to, just because it was mentioned as part of my friend Mr. Freeman's argument, is that there are a variety of testimony of witnesses who all confirmed that they had confronted Dr. Aluhu multiple times about his time and attendance discrepancies, about trying to find him and not being available, about manipulating patient schedules and not being available for work. There was an independent audit. Dr. Nadeau, who was the chief of staff in this case, came on staff in January 2017. Immediately the head of the part-time VA doctor's administration said Dr. Aluhu should be audited. That's when the audit began. A month later, Dr. Aluhu wrote this disclosure letter. A month after the audit began. And he was eventually terminated in May of 2017. So those are the facts. Those are all on the record. I think the easiest place to find that might be in page 6 and 7 of our brief, where we cite to the hearing testimony on that issue. And even though you've decided that they're just very limited matters of consideration and appeal, what consideration should be given to the close proximity in time between Dr. Nadeau's investigation into the absences and Dr. Aluhu's letter with respect to the contributing factor analysis? So with a broad brush, it's a substantial evidence case. So that's a fairly deferential standard of review. And here we're talking about whether the board judge weighed the evidence. And historically, courts have been pretty respectful of how the trial-level tribunals have weighed the evidence. So even though another court might have considered and come to different conclusions, if there is substantial evidence to support the decision, then we're bound by that? Then it should remain undisturbed, correct. And Judge Donald, I think you specifically mentioned how do we evaluate the contributing factor analysis. Historically, under Title V, Section 1221, Congress has explained that the most predominant test that a court should use is something called the knowledge and timing test. It's not the exclusive way to establish a contributing factor, but I think the fact that Congress laid it out in statute in two parts suggests that it's the default way. And so the knowledge and timing test goes, did the official taking the personnel action know of the disclosures? That's part one, did they know? Part two is, is the timing close enough in proximity that a reasonable person could conclude that it would evidence some type of prohibited personnel action? Here, I don't think the judge questioned the fact that the timing was sufficiently close, because we're talking about a disclosure that was made in February 2017 and a removal that occurred in May of 2017. Excuse me, Your Honor. So I think the board judge's finding was specifically on that knowledge factor, where the board judge found after hearing the context of the witness testimony, hearing the testimony of the proposing official, the deciding official, that these individuals really didn't have in mind, you know, we're taking this action because of this purported protective disclosure. And that's even assuming that we only get there if we assume that it's a protective disclosure in the first instance. The way courts have treated that analysis, the contributing factor analysis as a whole, is kind of a proximate cause test. So it is, there's some liberality built into the statute. Because if you read section 1221, it says, is there circumstantial evidence that would support that the deciding official knew of the disclosure at the time he or she took the personnel action? But here we know that Dr. Nadeau, who is the chief of staff, explained on the record, and again, the board judge credited this testimony, you know, he did not have the letter in mind. In fact, he didn't remember seeing the letter. And the only thing he said on the record was, I expected, maybe I saw it on the date that the letter was posted, on the front of the letter. But he had no recollection of the letter up until the hearing. The deciding official in this case, Ms. Fitzgerald Barron, who's the director of the Tennessee Valley hospital system, or health system, conclusively said, I didn't even know about the disclosure. I didn't know the subject of the disclosure. I didn't know the content of the disclosure. And so based on those two individuals' testimony, what the board judge had to conclude, based on the weight of the evidence before her, was that there isn't evidence. And there's no disputing evidence going the other way. So if we're talking about whether substantial evidence supports the board judge's finding that the disclosure wasn't a contributing factor to his removal, it would be on the petitioner to demonstrate what evidence shows the contrary. In fact, The employment context, totally apart from the administrative agency context, there's the cat's paw theory. Correct, Judge Moore. And Nadeau would be the cat with his paw, causing the ultimate decision maker to fire the client, Dr. Elliott here. So why shouldn't we say, because of the ambiguity in Nadeau's response about whether he saw it, first he says he didn't see it, then he said, well, I must have seen it, but it was at the time. Why shouldn't we be able to infer that he did see it and that his purpose was to get rid of Dr. Elliott? So there is the cat's paw theory. In fact, the closest case you'll find in the Federal Circuit speaking specifically to that issue, it's not on the contributing factor part of the analysis. It's actually in the car factor part of the analysis, where once the petitioner bears their prima facie burden to show that they have made the prima facie case that they made a protected disclosure. There's the car factors you would get into, and that then shifts the burden to the government to prove by clear and convincing evidence that they would have taken the action even absent the protected disclosure. And the second prong of the – there's three factors. The second prong is the motive to retaliate factor. There's a case called Miller v. Department of Justice decided by the Federal Circuit in 2016. I'm sorry, it's not in the response brief. And I can get the site for you either through a supplemental filing of some kind. But it's actually only in a concurring opinion where when the burden then shifts to the government to show that it didn't have motive to retaliate, it must show under that cat's paw theory that circumstantially the deciding official's actions weren't, for lack of a better word, infected by some type of retaliatory animus. And that was in a concurring opinion. But I think even in that case what the court had to – and it was in a concurring opinion. It wasn't in the majority – or the primary opinion. We would be looking at it for persuasive value whether it was – Correct, right. And so there are two things that I think have to be mentioned if that cat's paw theory would apply. And again, as far as I'm aware, it's never been applied under the contributing factor analysis of the whistleblower law by any appellate court. But even when you apply it to the car factors part of it, whether there's a motive to retaliate, what courts – or what the Miller Court found was that there was some type of influence that the proposing official would have to have had over the deciding official or some type of influence that the individuals reporting or proposing the action would have had to have had with regard to the deciding official such that the deciding official was infected by that. And we don't have evidence of that here. But the second thing is that the proposing official's actions demonstrate some type of retaliatory animus in and of itself. And we don't have that here either. So again, we're talking about a situation under cat's paw theory where no appellate court has applied it to the contributing factor analysis. But even then, when it has in a concurring opinion, it's done it because  and there was some demonstration of retaliatory animus. And I don't think that's too different from the discrimination cases that this court hears. Typically, you need some evidence showing that if we're going to apply cat's paw theory, there should be some evidence of influence and retaliatory animus. And we think that's absent from the evidence in this case. We've pointed to various portions of the record, I think in page 21 of our brief, citing the proposing and deciding official's testimony, both of whom explained credibly to the board judge in this case that we don't see we didn't even think about the letter at the time you proposed or decided the action. So one key issue is whether this letter is protected activity. And so why don't I sort of give you the devil's advocate view that it is protected activity, and you explain to me why it isn't. Sure. So I think it's important to know what the board judge did here. So the first thing the board judge had to do, and this is at the pleading level, is determine whether this allegation of a protected disclosure is a non-frivolous allegation. What the board judge did was she read the letter and said it's a non-frivolous allegation. We'll let it survive the pleading stage. But once you get past the pleading stage, you need to follow the statute and point to circumstantial evidence that demonstrates that a disinterested observer, a reasonable person, that's the standard in the statute, a reasonable person in your situation would believe that you were making a protected disclosure. So I think what the board judge did is read the first line and said, okay, patient care, VA hospital, it seems to be talking about some danger to patients. Let's it survive the pleading stage. Then on the back end, accepted all the evidence, heard the testimony, heard Dr. Alulu's testimony, heard about some of the things that were going on behind the letter and stuff that it omitted. For example, that, okay, the York campus doesn't have a cardiology care unit, but the letter makes no mention of the fact that the Nashville campus, which works in tandem with the York campus, did have a 24-hour dedicated cardiology care unit and that Dr. Alulu actually utilized this avenue of sending his critical care patients on a number of occasions when he realized that the York facility wasn't a proper place for it. Is there a distance between the two facilities? I had to Google this. It's about 30 miles. But it's a unitary hospital system. One's in Murfreesboro. The other one's in Nashville. But Dr. Alulu did avail himself of the Nashville campus when he realized that the York campus wasn't suited for his particular cardiology patient. And that's what's omitted from the letter. So when the board judge took everything in context based on the totality of the evidence, she decided two things. Number one is under the statute you're required to demonstrate a substantial and specific harm to public health or safety. I'll point out that in Section 1221 there are a variety of different categories of protected disclosures. Substantial and specific harm is the only one modified twice. So it not only has to be substantial, and I think Judge Donald, you pointed out with your first question to my friend Mr. Freeman, is this a substantial harm? I think the board judge credited that it could be substantial, but was it specific? So to meet your test, the letter would have had to have said, I tried to transfer patient A, John Smith, on a particular date, and the ICU wouldn't take him, and he had to go 30 miles to this other facility. I think that would be the most traditional way to do it. The Miller case that Mr. Freeman cites in his brief, the Miller versus VA case, it's a board case in 2002, is probably the most traditional way you would demonstrate a substantial and specific harm. In that case, the VA physician actually names specific instances where he had trouble getting the patients into the facility. But it doesn't have to be that specific. For example, if there's a like, and this is in the Chambers case that we cite, decided by the Federal Circuit, it could be a likelihood of harm, but you still have to be specific. What is the harm that you're talking about? In this case, what the board judge found is that it wasn't specific enough because only the first statement of the letter talks about some generalized harm, and then it just looks like an airing of grievances between two people who, frankly, just probably didn't like each other. I don't think that's what the whistleblower protection laws were designed to protect. It was meant to protect people who were trying to disclose government wrongdoing, not to air out personal grievances, not to protect themselves, shield themselves in a cloak when they realize they might be in trouble because they're under audit for some type of time discrepancies. Here the board judge evaluated the full context of the testimony surrounding the letter, evaluated the letter itself, dug a little bit deeper, and ultimately concluded that the evidence did not support that it was a protected disclosure. Again, there are two independent bases for the board judge's decision in this case. Number one, that the letter was not a protected disclosure, which alone is enough to affirm the board judge's decision, and the second part is that even if it was a protected disclosure, the letter wasn't a contributing factor to Dr. Huluhu's removal, which, again, independently is enough to affirm the board judge's decision. We respectfully request that this court affirm the board judge's decision in the case. Did we apply the substantial evidence test to both of those prongs? Correct. Yes, Judge. Thank you. Thank you, Judge. I'd like to respond to several of his points, if I may. The first point was this argument that the deciding official, the deciding official here is over the entire complex, which is a number of different facilities. Dr. Nadal basically said, this is what I want you to do, and she rubber stamped that. Now, I don't know that you can say that the deciding official can say, well, I really didn't know anything, and so I can do whatever I want. I think the law is that whatever Dr. Nadal suggested that the deciding official do, whatever he knew is imputed onto the deciding, the decision maker. I think that's common sense. I don't think you can get away with it by saying, well, the decision maker really didn't know anything. She's taking a recommendation from somebody and making a decision that way. The second point is, if you look at the letter, the first sentence of the letter says, every time I want to transfer a cardiac patient from the floor to the ICU is a battle. So that's specific. It's a cardiac patient. And then at the end it says, I'm also requesting all the administration authorities to address this issue on urgent basis. And that's where I get to the... So your opponent argues it has to be specific. How do you respond to that? I don't think the law means that you have to name a patient. That doesn't make any sense. If he's saying a number of patients and he's saying, I have these patients, are we saying that we're going to split hairs if we don't name a particular patient's name, that that means that he's not a whistleblower? You're saying that the specific action identified is enough to meet the criteria, that every time I want to admit patients to the cardiac unit, that's the specific action. And you say that's enough. That satisfies the specificity requirement? I believe so. Otherwise we would have to put a person's name in there of some kind. And I just have a few seconds left. So I want to mention something. And I appreciate you referring to me as friend. I may start doing that. Council mentioned shield from an audit. Where is the evidence that the formal audit came back and said he was doing something inappropriate? There's no evidence of that in the record that I could find. It was an informal audit by Dr. Nadau. By his assistant who didn't even know what Dr. Alou looked like. I still have a hard time rationalizing that. So, well, I'm out of time. We appreciate the arguments on both sides. And we will look carefully at the briefs as well. And the case will be submitted with the clerk call the next case.